**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fabian Hernandez, et al., | No. CV 16-03699-PHX-DGC (BSB) |
| Plaintiffs, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiffs, 10 men who were formerly incarcerated in the Arizona State Prison Complex-Eyman, Cook Unit,[1] brought this action against multiple Arizona Department of Corrections (ADC) employees, including Director Charles Ryan, Deputy Warden Jeffrey Freeland, Assistant Deputy Warden Shannon Thielman, 31 correctional officers and members of the ADC Tactical Support Unit, and 7 officers involved in security and criminal investigations. (Doc. 43.)[2] Plaintiffs allege violations of their constitutional rights under 42 U.S.C. §§ 1983 and 1985. (*Id.* ¶¶ 101–113.) Before the Court are State Defendants' Motion to Partially Dismiss Plaintiffs' Second Amended Complaint

---

[1] Plaintiffs are Fabian Hernandez, Joseph Artiaga, David Daniels, Jesus Garcia, Paul Harris, Nathaniel Hooks, Vincente Longoria, Guy Snider, Brandon Wilson, and Christopher Henderson. (Doc. 43 ¶ 3.) Hooks and Snider are still in custody, Wilson has passed away, and all other Plaintiffs have been released. (*Id.*)

[2] Plaintiffs initiated this lawsuit through counsel in Maricopa County Superior Court in June 2016. (Doc. 1, No. CV2016-008290.) In October 2016, Defendants removed the case to federal court. (*Id.*)

(Doc. 44)³ and Defendant Steven Dingman's Motion to Dismiss Second Amended Complaint. (Doc. 45.) The Court will grant in part and deny in part State Defendants' Motion and deny Dingman's Motion.

**I.     Federal Rule of Civil Procedure 12(b)(6)**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Dismissal of the complaint, or any claim within it, may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)). In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

---

³ State Defendants are Joseph Andrews, Jose Barnet, Michael Berlanga, Eric Bossom, Jason Buchholz, Brent Burtsfield, Ferdinand Caruso, Brian Cooper, Jeffrey Freeland, Laura Gilboy, Micah Graham, Henry Gullion, Richard Johnson, Jamie Llamas, Todd Masterson, Quincy Porto, Matthew Sanchez, Matthew Snare, Shannon Thielman, William Webster, Michael Wieden, Scott Wilson, and Robert Winfrey. (Doc. 44 at 1.)

In ruling on a motion to dismiss, a court's review is normally limited to the complaint itself, but a court may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Documents not physically attached to the complaint may be considered if their authenticity is not contested and "the plaintiff's complaint necessarily relies on them." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation omitted); *see Marder v. Lopez*, 450 F.3d 445 448 (9th Cir. 2006).

## II. State Defendants' Motion to Partially Dismiss

State Defendants argue that some of the individual Plaintiffs fail to sufficiently state Eighth Amendment claims for excessive force. (Doc. 44 at 4–6.) Defendants further argue that Plaintiffs fail to state supervisory-liability claims against Freeland and Thielman. (*Id.* at 6–8.)

### A. Eighth Amendment Claims

#### 1. Governing Standard

Under the Eighth Amendment, a defendant is liable for use of excessive physical force against prisoners. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). To state an Eighth Amendment claim, a plaintiff must allege that the use of force was an "unnecessary and wanton infliction of pain." *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir.2001). A plaintiff must allege facts that, if proven, would establish that prison officials applied force "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline. *Hudson v. McMillian*, 503 U.S 1, 7 (1992). In determining whether the constitutional line has been crossed, courts may consider the need for application of force, the relationship between that need and the amount of force used, the extent of injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual'

punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10.

The Eighth Amendment does not exclude liability for officers who stand by when another uses excessive force. Officers have a duty to intercede – a constitutional violation by a passive officer standing by is no different than a violation by an officer delivering blows. *See United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994)), *rev'd on other grounds*, 518 U.S. 81 (1996); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). Further, an excessive force claim may still lie even if a plaintiff does not have a clear recollection of the defendants' exact actions that caused injury, or if a plaintiff cannot identify the specific defendant officers who assaulted him. *See Santos v. Gates*, 287 F.3d 846, 851–52 (9th Cir. 2002) (the fact that the plaintiff had no clear recollection of the defendants' exact actions that caused his alleged injuries did not preclude the plaintiff's excessive force claims as a matter of law); *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986) (where the plaintiff could not identify the defendant officers who punched him, but he alleged that they were among the five officers around him when he was beaten, a jury could reasonably infer that the defendant officers were participants in punching and kicking the plaintiff), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 396 (1989).

### 2. Second Amended Complaint

Plaintiffs' claims arose during their confinement at the Cook Unit in June 2014. (Doc. 43 ¶ 3.) The Second Amended Complaint sets forth the following allegations:

On June 9 and 10, 2014, the Tactical Support Unit (TSU) conducted an operation that was ostensibly a Quarterly Search. (*Id.* ¶¶ 4, 38.) The operation's mission was to achieve a "full compliance" search of the Unit. (*Id.* ¶ 72.) Approximately 40 to 45 TSU officers participated. (*Id.* ¶ 19.) The identities of all participating TSU officers is presently unknown because officers disguised their identities during the operation by

refusing to identify themselves to Plaintiffs upon request; by removing their names and badge numbers from their uniforms prior to the operation; and by requiring Plaintiffs and other victim-inmates to keep their chins on their chests throughout the operation so as to make it difficult for the inmates to see around them. (*Id.* ¶¶ 20, 70(c) & (g).) Also, when the TSU Defendants entered the Unit, they were allowed to bypass the required check-in process at the main control room. (*Id.* ¶ 70(a).)

On each of the two days, June 9 and 10, 2014, the TSU Defendants ordered Plaintiffs and other victim inmates out of their cells. (*Id.* ¶ 38) Plaintiffs and the other inmates were wearing only their underwear, T-shirts, and shower sandals. (*Id.*) The TSU Defendants ordered the inmates to stand in a single-file line outdoors, where the temperatures exceeded 100 degrees, without shade or any UV protection. (*Id.* ¶ 39.) Various TSU officers were giving orders, which led to conflicting orders and confusion. (*Id.* ¶ 40.) Some of the inmates requested clarification as to which orders to follow. (*Id.* ¶ 41.) In response, one or more TSU Defendants would assault the inmates, often from behind. (*Id.* ¶ 42.) Once all the inmates were standing outside in a line, various inmates were assaulted by TSU Defendants for no reason or for reasons such as standing too far from the next inmate in line, failing to keep one's chin on his chest, or not moving quickly enough. (*Id.* ¶¶ 44–48.)

During the operation, the inmates were placed in handcuffs behind their backs. (*Id.* ¶ 68.) The TSU Defendants used K9s during their assaults on Plaintiffs and the other inmates. (*Id.* ¶ 58.) The assaults on victim inmates included "take downs," after which victim inmates were placed face down on the dirt while cuffed and, in some cases, left in this position for over two hours despite the high temperatures. (*Id.* ¶ 72(a).) Eventually, Plaintiffs and other victim inmates were escorted to the Day Room, near the showers, where the TSU Defendants searched each inmate. (*Id.* ¶ 50.) Much of the abuse occurred in the shower area, where there is limited use of security cameras purportedly to protect inmates' privacy. (*Id.* ¶ 70(f).) Throughout the operation, TSU Defendants

repeatedly used expletives and profanity and referenced the nature of Plaintiffs' convictions, some of which include sexual offenses. (*Id.* ¶¶ 37, 85.)

Several Plaintiffs and other inmates required medical attention for the injuries caused by the TSU Defendants. (*Id.* ¶ 61.) But when Plaintiffs and other inmates requested medical attention, the TSU Defendants required that before being taken to medical, an inmate had to make a statement into a video recorder that the inmate had assaulted the TSU Defendants. (*Id.* ¶¶ 62, 66.) As a result, several Plaintiffs were coerced to refuse medical attention despite their injuries, and other Plaintiffs complied with the demand to provide a false recorded statement because they felt they could not go without medical attention. (*Id.* ¶¶ 63–64.)

During the operation, TSU Defendants seized "nuisance contraband," including TVs, stereo equipment, hobby crafts, clothing, blankets, etc. from more than 200 inmates. (*Id.* ¶ 72(g).) More than 9 truckloads of seized property were removed from the facility following the 2-day operation, and much of the seized property was disposed of contrary to ADC policy. (*Id.* ¶ 72(i) & (j).)

### 3. Plaintiffs' Allegations Subject to the Motion to Dismiss
#### a. Hernandez

Plaintiff Hernandez alleged that TSU officers came into his housing area yelling directions to strip to boxers and shower shoes, and he was directed to take off his long-sleeved shirt. (Doc. 43 ¶ 88.) As he was trying to comply, he receive conflicting instructions; he was assaulted and suffered injuries to his knees and back, which continue to cause significant pain; and he suffered cuts to his left forearm, scratches to his head and knees, injury to his lower back and knees, and numbness in his left hand. (*Id.* ¶¶ 88–89.) State Defendants argue that these allegations inadequately plead how and why the alleged assault constituted force that was sadistic and malicious and that Hernandez fails to allege that the force used was unjustified by the circumstances. (Doc. 44 at 4.)

Plaintiffs attach to their Response copies of grievance documents Hernandez submitted about the incident. (Doc. 50, Ex. A.) In his grievances, Hernandez stated that

1  he had just taken off his long-sleeved shirt and was walking to the back of the line as
2  ordered when an officer smacked him in the back of the head. (Doc. 50-1 at 7, 9.)  Then
3  another officer grabbed Hernandez and slammed him down on the top of a small garbage
4  can, cuffed him, and elbowed him in the back of the head. (*Id.*)  Officers picked
5  Hernandez up by the arms and brought him outside where they forced him to his knees
6  and then shoved his face in the dirt. (*Id.*)  The officers yelled obscenities at Hernandez
7  and kept calling him a "faggot piece of shit." (*Id.*)  The officers kicked dirt in his face
8  and left him lying there for 15-20 minutes. (*Id.*)

9  The grievances were not attached to the Second Amended Complaint, but they are referred to in the pleading. Plaintiffs allege that they participated in the prison's grievance process and submitted to the administrative resolution of their claims. (Doc. 43 ¶ 99.) Plaintiffs allege that they were not provided any information as to the resolution of their grievances against the officers, and that Defendants repeatedly denied their administrative pleas for redress. (*Id.* ¶¶ 2, 100.) Plaintiffs also allege that approximately 55 victim inmates filed or attempted to file complaints against the TSU Defendants for violently assaulting them without cause, but an internal investigation concluded that all 55 complaints were unsubstantiated due to lack of evidence. (*Id.* ¶¶ 60, 74.)

Hernandez's grievances are central to his claim. They set forth facts supporting essential elements of an Eighth Amendment excessive force claim, and State Defendants do not object to the grievance documents or contest their authenticity. (*See* Doc. 55.) Accordingly, the Court will consider the documents. *See Marder*, 450 F.3d at 448; *Ritchie*, 342 F.3d at 908; *see also Clinton v. Luke*, No. CV 08-4179-DOC (OP), 2010 WL 114208, at *5 (C.D. Cal. Jan. 8, 2010) (although the plaintiff's grievance documents were not attached to or referenced in the complaint, the district court took judicial notice of the grievances submitted with the plaintiff's response to the motion to dismiss because the plaintiff's deliberate indifference claim necessarily relied on the grievances).

Taking Hernandez's allegations as true, he was complying or attempting to comply with orders, he posed no threat to the officers or other inmates, and there was no exigency or need to restore order. And yet officers hit and elbowed Hernandez in the head, slammed him onto a garbage can, and shoved him face first into the dirt while he was cuffed. In the circumstances alleged by Hernandez, there was no need for force. *See Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (officers may use force only in proportion to the need in each situation). Further, the officers' alleged use of profane and obscene language with references to the nature of Hernandez's convictions could be found to manifest a malicious intent to punish Hernandez. (Doc. 43 ¶¶ 37, 85.) The TSU officers' alleged affirmative steps to hide their identities from Plaintiffs also suggest the intent to cause harm in a malicious manner and to avoid punishment. (*Id.* ¶ 70(a), (c), (e)-(g).) Hernandez's and the Second Amended Complaint's allegations are sufficient to state a plausible claim for excessive force. State Defendants' Motion to Dismiss will be denied as to Hernandez's claim.

### b. Artiaga

Plaintiff Artiaga alleged that he was assaulted twice during the operation; he was hit in the back of the head and chest, and he was hit with a fist in the back. (Doc. ¶¶ 43 90.) He alleged that he suffered injuries and pain. (*Id.*) State Defendants argue that these allegations are insufficient because they fail to specify why Artiaga was assaulted and whether the attack was unprovoked. (Doc. 44 at 4.)

In their Response, Plaintiffs contend that the allegations in the rest of the Second Amended Complaint—which concern all victim inmates, including Artiaga—are sufficient to show that the assaults occurred without provocation. (Doc. 50 at 7, citing Doc. 43 ¶ 38.) Plaintiffs also attach copies of grievances Artiaga submitted about the incident. (Doc. 50, Ex. C.) In his grievances, Artiaga stated that on June 10, 2014, he was assaulted twice by the TSU team. (Doc. 50-1 at 37.) He was in line formation when Defendant Sanchez struck him in the back of his head for not having his chin all the way to his chest. (*Id.* at 35, 37.) Artiaga was then standing in line with his eyes closed when

he was hit very hard with a fist in the middle of his back for not being closer to the inmate in front of him. (*Id.* at 37.)

Artiaga's grievances were incorporated by reference into the Second Amended Complaint, and Defendants do not object to or dispute their authenticity. His claim necessarily relies on the grievances. *See Lee*, 250 F.3d at 688.

Artiaga fails to specify the extent of the injuries he suffered as a result of the TSU officers' conduct, but that does not end the Eighth Amendment inquiry. *See Hudson*, 503 U.S. at 7, 9. Taking Artiaga's facts as true, along with the other facts pleaded in the Second Amended Complaint, Artiaga did not act aggressively or pose a threat to officers or other inmates and there was no riot or emergency necessitating a forceful response. These allegations belie any claim that Defendants officers' striking of Artiaga in the head and back was done in a good faith effort to restore or maintain order. Artiaga's and the Second Amended Complaint's allegations are sufficient to state a plausible claim of excessive force, and State Defendants' Motion to Dismiss will be denied as to his claim.

### c. Garcia

Plaintiff Garcia alleged that he suffered from the use of excessive force during the operation and suffered physical injuries as a result. (Doc. 43 ¶ 92.) State Defendants contend that Garcia's allegations are conclusory and insufficient to state a claim, and that there are no other facts asserted in the Second Amended Complaint that specify how officers employed excessive force on Garcia. (Doc. 44 at 5.)

In their Response, Plaintiffs assert that when reading the Second Amended Complaint as a whole, the allegations are sufficient to show that Garcia, along with other Plaintiffs, was the victim of a mass assault by TSU officers; that the assault was unprovoked; and that the TSU officers gave conflicting orders and then assaulted Plaintiffs when they sought clarification. (Doc. 50 at 8, citing Doc. 43 ¶¶ 38–42.) Plaintiffs also attach grievance documents that Garcia submitted about the incident. (Doc. 50, Ex. D.) In his grievances, Garcia reported that a TSU officer grabbed him by the neck and shoulders and slammed him to the floor, which caused injury to his finger,

and that TSU officers used excessive force during the operation. (Doc. 50-1 at 41, 44.) Garcia stated that he continues to have problems with his back and neck—including stiffness, pain, and spasms—and he does not have full range of motion in his finger. (*Id.* at 43.)

Garcia's grievances were incorporated by reference into the Second Amended Complaint, and Defendants do not object to or contest their authenticity. His claim necessarily relies on the grievances. *See Lee*, 250 F.3d at 688.

Construing Garcia's allegations as true, there was no riot or emergency requiring a forceful response by TSU officers; the officers' assaults on Plaintiffs were unprovoked; Garcia was slammed to the floor by a TSU officer; and, as a result of the assault, Garcia continues to suffer pain from injury to his back, neck, and finger. Taken as a whole, the Second Amended Complaint and grievance documents contain sufficient facts for the Court to infer that the TSU officer who slammed Garcia to the floor used unnecessary force without provocation. *See Iqbal*, 556 U.S. at 678. The allegations are sufficient to state a plausible excessive force claim, and State Defendants' Motion to Dismiss will be denied as to Garcia's claim.

### d. Longoria

Plaintiff Longoria alleged that he witnessed officers using excessive force on another inmate, and officers instructed Longoria to go around the inmate. (Doc. 43 ¶ 95.) When Longoria asked how to do so, he was thrown to the ground; his head was pushed to the ground; and he was subjected to profanity and expletives related to the nature of his conviction. (*Id.*) Longoria alleged that he was then taken to medical and was again subjected to excessive force when he was slammed to the ground a second time. (*Id.*) State Defendants argue that, without more, Longoria's allegations fail to state an adequate claim and that alleged use of profanity and expletives by officers do not support an Eighth Amendment violation. (Doc. 44 at 5.)

With their Response, Plaintiffs attach copies of grievance documents Longoria submitted about the incident. (Doc. 50, Ex. B.) In his grievance, Longoria stated that

when he was in a single file line, an inmate in front of him was thrown to the ground, and an officer ordered Longoria to go around the incident. (Doc. 50-1 at 25.) When Longoria asked "which way," the officer grabbed him by the back of the neck and arm, pushed him, and then threw him to the ground. (*Id.*) The officer told Longoria to keep his head down, and the officer pushed his head down into the ground a couple of times, resulting in a large lump above Longoria's right eye. (*Id.*) The officer cuffed Longoria and took him outside and forced him to the ground in the dirt. (*Id.*) Officers threatened to harm him if he moved, they called him a "chomo [child molester]," and they kicked dirt in his fact. (*Id.*) Longoria stated that he continued to keep his mouth shut. (*Id.*) Then, the officers picked him up and took him to medical to be checked by a nurse. (*Id.*) When he left medical, he was walking when officers again forced him to the ground with his face in the dirt. (*Id.*) Longoria stated that he still continued to keep his mouth shut. (*Id.*) After he got a headache and began to feel sleepy, Longoria was taken to medical again where a nurse checked his vitals, his right eye, and bruised ribs. (*Id.*)

Longoria's grievances are incorporated by reference into the Second Amended Complaint, and Defendants do not object to or dispute their authenticity. His claim necessarily relies on the grievances. *See Lee*, 250 F.3d at 688.

The allegations in the Second Amended Complaint and Longoria's grievance show that Longoria was complying or attempting to comply with orders, he did not act aggressively or talk back to the officers, and there was no emergency or riot that necessitated a forceful response from the TSU officers. Defendant officers nonetheless threw Longoria to the ground and pushed his head into the ground on two occasions. Verbal harassment, by itself, does not violate the Eighth Amendment. *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) (verbal harassment does not state an Eighth Amendment claim). But Defendant officers' expletives and reference to the nature of Longoria's conviction as they were employing unnecessary force could be found to manifest a malicious intent to punish him. In short, the allegations are sufficient to state a plausible

excessive force claim, and State Defendants' Motion to Dismiss will be denied as to Longoria's claim.

### e. Wilson

In the Second Amended Complaint, Plaintiffs assert that Wilson was a Plaintiff who was housed in the Cook Unit in June 2014, and that he was released from custody and then died in a vehicle accident. (Doc. 43 ¶¶ 3, 97.) There are no other allegations that mention Wilson or assert what happened to him during the TSU operation. (*See id.*) State Defendants argue that because Wilson does not assert any facts related to alleged unconstitutional conduct, his or his estate's claim should be dismissed. (Doc. 44 at 6.)

In their Response, Plaintiffs do not respond to State Defendants' argument that Wilson fails to state a claim. (*See* Doc. 50.) Instead, Plaintiffs assert that Wilson is deceased and counsel needs additional time to attempt to identify an individual to represent his estate and be substituted as the real party in interest. (*Id.* at 8-9.) They rely on the Ninth Circuit's holding in *Jones v. Las Vegas Metropolitan Police Department* for the proposition that, under Federal Rule of Civil Procedure 17, a court may not dismiss an action for failure to prosecute in the name of the real party in interest until a reasonable time has been allowed for substitution. (*Id.* at 9, citing 873 F.3d 1123 (9th Cir. 2017).)

In *Jones*, the plaintiffs were the decedent's parents who brought Fourth Amendment excessive force claims against a city police department and officers, but did not assert the claims as executor or administrator of the decedent's estate as required. 873 F.3d at 1128. The district court granted summary judgment to the defendants. *Id.* at 1127. On appeal, the Ninth Circuit found that the district court correctly granted summary judgment on the basis that there was no proper plaintiff for the Fourth Amendment claims, but held that Rule 17 required the district court to give the plaintiffs a reasonable opportunity to cure their error. *Id.* at 1128–29. Notably, there were viable Fourth Amendment excessive force claims alleged in *Jones*; the claims survived to the summary judgment stage in the district court, and the Ninth Circuit determined that there

was a question of fact whether the defendant officers' actions were unreasonable. *Id.* at 1130-31.

Here, the Court does not reach the question of whether a claim is brought by the proper party or whether Rule 17 applies because there is no underlying claim. Plaintiffs fail to assert any allegations that could plausibly support an excessive force claim by Wilson or his estate. Accordingly, Defendants' Motion to Dismiss will be granted as to a claim that TSU Defendants used excessive force against Wilson.

### B. Supervisor Liability Claims

#### 1. Governing Standard

"A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under [§]1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see Iqbal*, 556 U.S. at 676 ("[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). "A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor." *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011). "[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates[,]" and a sufficient causal connection between his or her wrongful conduct and the violation. *Id.*

The Ninth Circuit's holding in *Starr* illustrates the requirements for stating a claim of supervisor liability. The plaintiff in *Starr* alleged that the sheriff knew or should have known about the dangers in the jail and was deliberately indifferent to them. *Id.* at 1204-05. The plaintiff alleged that the sheriff received weekly reports from deputies responsible for reporting deaths and injuries in the jail; the sheriff signed a memorandum that addressed continuing constitutional violations in the jail; and the sheriff knew of a

settlement agreement in a civil case where the inmate-plaintiffs had sustained severe injuries. *Id.* at 1209-12. The appellate court found that the plaintiff sufficiently alleged a deliberate indifference supervisor liability claim against the sheriff because the complaint included detailed factual allegations that plausibly suggested the sheriff "acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent to the danger posed to Starr." *Id.* at 1204-05, 1216.

### 2. Freeland

State Defendants argue that Plaintiffs fail to state a claim against Freeland because they do not identify the specific unconstitutional conduct that Freeland knew about, they fail to allege that Freeland specifically ordered any particular officer or officers to use excessive force against a particular prisoner, and they fail to specify which individual Plaintiffs claim to have been injured by Freeland's conduct. (Doc. 44 at 8.)

In the Second Amended Complaint, Plaintiffs' allegations include the following:

- Freeland, as the Cook Unit Deputy Warden, has a duty to supervise officers (Doc. 43 ¶ 9);

- during the June 9 and 10, 2014 operation, there were numerous instances of TSU officers using excessive force on Plaintiffs as they attempted to comply with officers' orders—including punches and strikes to the back, head, and neck; violent take-downs, knees slammed into backs, and extended exposure to excessive heat without protection (*Id.* ¶¶ 72(a), 90–96);

- Freeland was advised during the operation of ongoing instances of excessive force by officers (*Id.* ¶ 10);

- Freeland participated in or witnessed the assaults on Plaintiffs and other inmates on June 9 and 10, 2014 (*Id.* ¶ 26);

- Freeland had the opportunity to prevent the violations but failed to do so (*Id.*); and

- Plaintiffs suffered injuries as a result of the TSU officers' conduct during the operation. (*Id.* ¶¶ 89-96, 112-113.)

Taking these allegations as true, the Court can infer that Freeland was aware of the operation on June 9 and 10, 2014 at the Cook Unit; that he knew officers were using

excessive force as the operation was occurring; and that he had the opportunity to stop the alleged violations, but did not. Plaintiffs' allegations plausibly suggest that Freeland "acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent to the danger posed to" Plaintiffs during the operation. *Starr*, 652 F.3d at 1204-05, 1216. Consequently, Plaintiffs sufficiently state a plausible claim for supervisory liability against Freeland, and State Defendants' Motion to Dismiss will be denied as to Freeland.

### 3. Thielman

Defendants argue that Plaintiffs' allegations are insufficient to state a supervisory liability claim against Thielman because Plaintiffs do not state with particularity that she personally participated in allowing certain prisoners to be in hot weather conditions that subjected them to suffering, nor do Plaintiffs name themselves in relation to the hot-weather claim. (Doc. 44 at 8.) As mentioned, a defendant's personal participation in an alleged violation is not the only avenue for supervisor liability. Liability also exists where the defendant supervisor refused to terminate the acts of others that the defendant knew or reasonably should have known would result in constitutional injury. *See Starr*, 652 F.3d 1202, 1207-08.

In the Second Amended Complaint, Plaintiffs' allegations include the following:

• Thielman, as the Cook Unit Assistant Deputy Warden, had a duty to supervise officers (Doc. 43 ¶ 11);

• during the June 9 and 10, 2014 operation, there were numerous instances of TSU officers using excessive force on Plaintiffs as they attempted to comply with officers' orders—including punches and strikes to the back, head, and neck; violent take-downs, knees slammed into backs, and extended exposure to excessive heat without protection (*Id.* ¶¶ 72(a), 90-96);

• Thielman was apprised of the mistreatment and abusive conduct of the officers in her charge. (*Id.*);

• Thielman was involved in orchestrating the organized assaults and conspiracy against Plaintiffs (*Id.*);

• on June 10, 2015, two officers voiced their concerns to Thielman that it was too hot and unsafe to leave inmates lying in the dirt and, in response, Thielman left the premises and never went to the yard to check on the welfare of the inmates or make any appropriate adjustments (*Id.* ¶ 72(d)-(e));

• Thielman deliberately failed to ensure the safety of inmates within her care during and after the operation. (*Id.* ¶ 72(f)); and

• Plaintiffs suffered injuries as a result of the TSU officers' use of force during the operation and as a result of officers forcing Plaintiffs to lie on their stomachs outdoors in excessive heat. (*Id.* ¶¶ 89-96, 112-113).

These allegations plausibly suggest that Thielman acquiesced in unconstitutional conduct of her subordinates and was deliberately indifferent to the danger posed to Plaintiffs during the operation. *See Starr*, 652 F.3d at 1204-05, 1216. State Defendants' Motion to Dismiss will therefore be denied as to the supervisor liability claim against Thielman.

### III. Dingman's Motion to Dismiss

In the Second Amended Complaint, individual Defendant TSU officers are collectively referred to as "TSU Defendants," and allegations involving the TSU Defendants' use of excessive force are set forth above. (Doc. 43 ¶ 12.) Plaintiffs allege that Dingman is a TSU officer and Correctional Officer II "who was positively identified as having been a primary motivator of the organized assault and conspiracy against Plaintiffs." (*Id.* ¶ 12(j).)

Defendant Dingman argues that because Plaintiffs fail to allege any specific acts by him, the Court cannot draw a reasonable inference that he is culpable for any constitutional violations and all claims against him should be dismissed. (Doc. 45 at1, 4-6.) Dingman contends that under the *Iqbal* pleading standard, a complaint must allege the identity of the particular defendant responsible for specific acts that violate a plaintiff's civil rights, and this requires "articulating which defendant did what to whom[.]" (*Id.* at 3, quoting *Dupris v. McDonald*, Nos. 08-8132-PCT-PGR, 08-8133-PCT-PGR, 2010 WL 231548, at *3 (D. Ariz. Jan. 13, 2010).)

Dingman relies on this Court's decision in *Ferreira v. Arpaio*, where the plaintiff—the personal representative of the estate of the decedent—brought state claims and § 1983 claims against numerous employees at the county jail, where the decedent had been assaulted by his new cell mate and later died of his injuries. (*Id.* at 6, citing No. CV-15-01845-PHX-JAT, 2016 WL 3970224, at *1, 6–7 (D. Ariz. July 25, 2016)). The district court dismissed one of the defendants because the plaintiff merely pleaded that he worked at the jail and was on duty the day of the assault; there were no facts indicating that the defendant was involved in the decision to place the inmate in the decedent's cell, that the defendant knew the inmate had been placed in decedent's cell, or that the defendant was anywhere near the incident. *Ferreira*, 2016 WL 3970224, at *6. The district court found that the facts failed to establish that the defendant was "an integral participant in the actions that led to [decedent's] death," and the defendant's name "appears nowhere in the pleaded facts, save for being named as an employee who was at the [jail]" that day. *Id.*, at *7. The *Ferreira* plaintiff argued that she was at an "informational disadvantage" at the pre-discovery stage, in part because she could not have known of the individual defendants' conduct until the jail released the investigation related to the incident. *Id.* The district court rejected that argument, finding that case law on which the plaintiff relied related to the pre-*Iqbal* standard; the plaintiff had received the jail's investigation report eight months before filing the amended pleading; the plaintiff was represented by counsel; and, even if there was some "informational disadvantage" and the plaintiff was given some benefit of the doubt to go along with the specific facts pleaded, those facts were insufficient to state a plausible claim for relief as to the defendant. *Id.*

According to Dingman, the factual and procedural circumstances in *Ferreira* are similar to the instant action because Plaintiffs, who are represented by counsel, do not name Dingman in any of the specific allegations in the Second Amended Complaint and Plaintiffs argue that they are at an "informational disadvantage" at the pre-discovery stage. (Doc. 45 at 6-8.) In the Second Amended Complaint, Plaintiffs assert that they

1  have received investigation reports that are so heavily redacted they are rendered useless,
2  and, despite repeated requests under public record laws for surveillance footage of the
3  yard, recordings of interviews that were conducted, other videos, and copies of
4  department policies, the ADC and the State have failed or refused to provide such
5  records. (Doc. 43 ¶¶ 33-34, 79-83.)

Dingman contends that *Iqbal* requires specific allegations as to what each defendant did and to whom. (Doc. 45 at 3.) But Dingman fails to address Ninth Circuit cases holding that excessive force claims may proceed even when the plaintiff cannot identify the defendant who assaulted him or allege the actions of specific defendants. *See Santos*, 287 F.3d at 851–52; *Rutherford*, 780 F.2d at 1448. There is no indication that *Iqbal* overruled these cases such that a plaintiff cannot state a claim for excessive force unless a specific defendant can be connected to specific conduct.

Further, unlike the plaintiff in *Ferreira*, Plaintiffs do not simply allege that Dingman was on duty at the prison the day violations occurred. Rather, they specifically allege that Dingman was one of the TSU officers involved with the operation conducted in the Cook Unit on June 9 and 10, 2014. (*Id.* ¶¶ 12(j), 38.) Plaintiffs allege that approximately 40 TSU officers participated in the operation where they assaulted Plaintiffs and other inmates without provocation. (*Id.* ¶ 19.) The allegations establish that the operation and alleged excessive force occurred throughout the Cook Unit—in the housing area, outside, and in the Day Room near the showers. (*Id.* ¶¶ 28-39, 50-51, 55, 70(g), 72(a), 88, 93.) Taking these facts as true, it is plausible that Dingman, as one of the TSU officers involved in the operation in the Cook Unit on June 9 and 10, 2014, either participated in using excessive force against inmates or observed other TSU officers doing so and failed to intercede. *See Koon*, 34 F.3d at 1447 n.25; *Cunningham*, 229 F.3d at 1289.

Accordingly, at this stage, Plaintiffs' allegations are sufficient to state an excessive force claim against Dingman, and his Motion to Dismiss will be denied.

///

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to State Defendants' Motion to Partially Dismiss (Doc. 44) and Defendant Dingman's Motion to Dismiss (Doc. 45).

(2) State Defendants' Motion to Partially Dismiss (Doc. 44) is **granted in part** and **denied in part** as follows:

    (a) the Motion is **granted** as to the claim that TSU Defendants used excessive force against Wilson; and

    (b) the Motion is otherwise **denied**.

(3) Defendant Dingman's Motion to Dismiss (Doc. 45) is **denied**.

(4) Defendant Wilson is dismissed from this action without prejudice.

Dated this 30th day of April, 2018.

*/s/ David G. Campbell*
David G. Campbell
United States District Judge